JUDGE KAPLAN

**07 CV 366**

Index No.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHRISTOPHER SCHUH and DIANE SCHUH,

Plaintiffs,

-against-

DRUCKMAN & SINEL, LLP; HSBC MORTGAGE
SERVICES; MORTGAGE ELECTRONIC SERVICE
SYSTEMS; FIDELITY NATIONAL FINANCIAL, INC.;
FIDELITY NATIONAL DEFAULT SOLUTIONS; DORY
GOEBEL; MARIA OLIVARI; EDWARD C. KLEIN;
JANE DOE-1 through 4; RICHARD ROE-through 4; and
UNKNOWN TRUST 1 through 4, the last twelve being
fictitious names, the real names of said defendants being
presently unknown to plaintiffs, said fictitious names being
intended to designate persons and/or entities who are acting
in concert with the defendants,

Defendants,



RECEIVED
JAN 17 2007
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

JOHN C. KLOTZ
Attorney for the Plaintiffs
350 Fifth Avenue, Suite 4810
New York, New York 10118
(212) 639-2600

# TABLE OF CONTENTS

INTRODUCTORY ALLEGATIONS ...................................................................... 1
  I.   Summary of Case ...................................................................................... 1
  II.   Jurisdiction and venue ........................................................................... 2
  III.   Parties ..................................................................................................... 3
     a.   Plaintiffs ............................................................................................. 3
     b.   Defendants .......................................................................................... 3
  IV.  The Fidelity Default Enterprise ............................................................ 5
     a.   Organization of  Mortgage Financing ............................................... 5
     b.   Default Mortgage Servicing ............................................................... 6
     c.   Mortgage Servicing Fraud ................................................................. 7
     d.   The Fidelity Default Enterprise ........................................................ 8
COUNT ONE: RACKETEERING ACTS N THE CONDUCT OF THE FIDELITY
DEFAULT ENTERPRISE.................................................................................... 10
  I.   The Scheme and Artifice to Defraud Plaintiffs................................... 10
     a.   The mortgage loan and note.............................................................. 10
     b.   The foreclosure action and frauds on the court............................... 12
     c.   Defendants' frustration of Plaintiffs efforts to close the first foreclosure sale
     and pay-off the mortgage. ................................................................... 15
  II.   Defendants' Specific Racketeering Acts ............................................. 17
     Conspiracy ............................................................................................. 19
  III.   Damages................................................................................................ 19
COUNT TWO: VIOLATIONS OF FDCPA ....................................................... 20
COUNT THREE: COMMON LAW FRAUD....................................................... 21
COUNT FOUR: DECLARATORY JUDGMENT, EQUITABLE LIEN AND
INJUNCTION................................................................................................... 22

TABLE OF EXHIBITS

RICO EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Photographs of Schuh home |
| B | Legal Description of Schuh home |
| C | Dory Goebel Affidavit |
| D | Fibdelity Web page |
| E | Mortgage and Note |
| F | Assingment from PMC to Beneficial and |
| G | Assignment to MERS as Nominee of Household |
| H | Letter from Household (4/13/04) |
| I | Summons & Complaint |
| J | Plaintiffs' Reply to Summons and Complaint |
| K | Motion for Summary Judgment |
| L | Summary Judgment |
| M | Affirmation of  Edward Klein |
| N | Judgment of Foreclosure |
| O | Countrywide Letter to HSBC |
| P | Attorney Romano's letter to Court |
| Q | Terms of Sale |
| R | Receipt of sale |
| S | October 26, 2006 Pay-off |
| T | Payout of November 29, 2006 |
| U | Deposit by Schuh 12/15/06 |
| V | Deposit by Schuh  01/04/07 |
| X | Olivari wire canceling closing |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

CHRISTOPHER SCHUH and DIANE SCHUH,                Index No.

                                    Plaintiffs,                **COMPLAINT**

                   -against-                      **PLAINTIFFS DEMAND
                                                     TRIAL BY JURY**

DRUCKMAN & SINEL, LLP; HSBC NORTH
AMERICA, HSBC BANK USA, NA; HSBC
MORTGAGE SERVICES; MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS; MERS
CORP.; FIDELITY NATIONAL FINANCIAL, INC.;
FIDELITY NATIONAL DEFAULT SOLUTIONS;
DORY GOEBEL; MARIA OLIVARI; EDWARD C.
KLEIN; JANE DOE-1 through 4; RICHARD ROE-1
through 4;  and UNKNOWN TRUST 1 through 4, the
last twelve being fictitious names, the real names of said
defendants being presently unknown to plaintiffs, said
fictitious names being intended to designate persons
and/or entities who are acting in concert with the
defendants,

                                    Defendants.

----------------------------------------------------------------X


        Plaintiffs, complaining of defendants by their attorney JOHN C. KLOTZ, allege

for their complaint:


                        **INTRODUCTORY ALLEGATIONS**


**I.        Summary of Case**


        1.     Plaintiffs bring this action for damages they have suffered by reason of the

attempts of the defendants, their associates, and co-conspirators, to wrongfully eject them

from their home of more than 15 years. The activities of the defendants were, and are,

unlawful racketeering activity that gives rise to relief pursuant to the provisions of

Section 1961 *et seq*. of Tile 18 of the United States Code ("U.S.C."), Chapter 96, popularly known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"). While ostensibly seeking to foreclose the mortgage they are in fact seeking to reap profits by obtaining their home at a fraction of its value. To accomplish this result they have engaged in extra-judicial misconduct and fraud on he courts of New York State.

2.     In addition, plaintiffs allege violations of federal remedial statutes including the Fair Debt Collection Practices Act  ("FDCPA"), 15 U.S.C. § 1692 et seq; seek a declaration of rights among the parties pursuant to 28 USC 2201;  and state common law claims that allow injunctive as well as pecuniary relief, and of which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367

## II.     Jurisdiction and venue

3.     Jurisdiction of this action is founded upon the existence of a federal question arising under RICO, 18 U.S.C. §1964(c); FDCPA, 15 U.S.C. 1692k; 28 U.S.C. §2201; 28 U.S.C. §2202; 28 U.S.C. §1331; and 28 U.S.C. § 1367.

4.     Venue is founded upon 18 U.S.C. §1965(a) which provides that "Any civil action or proceeding under this chapter  against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs."

5.     Druckman & Sinel, LLP (the "Druckman firm") transacts business within the Southern District of New York at office located at 7, Penn Plaza, 8th Floor, New York, NY 10001.

6.     Each of the defendants is either a resident of the State of New York or an individual or business organization that has committed tortious conduct intending that it have an impact within New York State.

### III.    Parties

**a.** *Plaintiffs*

7.      At all pertinent times plaintiffs Diane and Christopher Schuh resided at 20 Old River Road, Corinth, New York having a mailing address of P.O. Box 668, Lake Luzerne, New York 12846. Pictures of there home appear as Exhibit A, annexed and it legal description as Exhibit B, annexed.

**b.** *Defendants*

8.      Defendant DRUCKMAN FIRM is a law firm engaged in the practice of law including collection of debts as a debt collector for mortgage servicers and investors as well as the assistance in the transfer and disposition of Real Estate Owned ("REO") property, obtained via mortgage foreclosure proceedings.

9.      .Defendant HSBC BANK USA, N.A. is a corporation having its principal office in Prospect Heights, Illinois and operates numerous branches in the State of New York from which it realizes many millions of dollars of income.

10.      Defendant HSBC MORTGAGE SERVICES is a wholly owned subsidiary and/or division of HSBC BANK, having its principal office at 636 Grand Regency Blvd. Brandon, Florida. HSBC MORTGAGE SERVICES "mortgage loans in New York State.

11.      Defendant MERSCORP is a corporation having its principal place of business at 1595 Spring Hill Road, Suite 310, Vienna, Virginia. MERSCORP owns operates defendant with MORTGAGE ELECTRONIC REGISTRATION SYSTEMS; INC. as a wholly owned subsidiary and or division of MERSCORP having its principal office at 1595 Spring Hill Road, Suite 310, Vienna, Virginia. Defendant MERS is authorized to do business in New York and has brought law suits in New York State on behalf of undisclosed principals.

12.      Defendant FIDELITY NATIONAL FINANCIAL, INC. ("FIDELITY NATIONAL") is a corporation having it principal office and corporate headquarters at 601 Riverside Avenue, Jacksonville, Florida. In addition to the divisions set forth below,

FIDELITY NATIONAL supplies a range of services and products used by mortgage servicers including title insurance, Broker Price Opinions ("BPOs), property inspections, property preservation services and, most importantly, computerized mortgages servicing and accounting systems for over 50% of the mortgage loans in the United States, including the mortgage of the plaintiffs.

13.     Defendant FIDELITY NATIONAL DEFAULT SOLUTIONS (FIDELITY DEFAULT") is a division and/or wholly owned subsidiary of FIDELITY NATIONAL having an office and principal place of business at 15661 Red Hill Ave., Suite 201, Tustin, California and operating an office for Foreclosure and Bankruptcy Services ("FIDELITY FORECLOSURE SERVICES") at 1270 Northland Dr., Suite 200, Mendota Heights, Minnesota. FIDELITY FORECLOSURE  supplies record-keeping and litigation support for actions brought to foreclose mortgage in New York State, including the preparation and verification of multitudinous affidavits which are filed with various court clerks in New York State.

14.     Defendant DORY GOEBEL is employed in the office of FIDELITY FORECLOSURE SERVICES and oversees a section of 17 individuals who claim to produce 1,000 sworn affidavits a day for filing in state and federal litigation brought by FIDELITY NATIONAL clients including MERS and HSBC. Her section produced several boiler plate documents used in the MERS foreclosure of Schuh's home and she personally signed an affidavit which was intended to be, and was in fact, filed in that litigation. (See EXHIBIT C)

15.     Defendant MARIA OLIVARI ("OLIVARI") is an attorney admitted to practice in New York State and an associate of the DRUCKMAN FIRM who has signed and filed affidavits on behalf of MERS, HSBC and FIDELITY NATIONAL in New York in the MERS foreclosure action.

16.     At pertinent times, Defendant EDWARD C. KLEIN ("KLEIN") was an attorney admitted to practice in the State of New York and an associate of the DRUCKMAN FIRM and who has signed and filed affidavits in New York that are the subject of this action.

17.     Defendants JANE DOES-1 to 4, RICHARD ROES 1 to 4 and CONCEALED TRUSTS 1 through 4 are fictitious names, the real names of said defendants being presently unknown to plaintiffs, said fictitious names being intended to designate persons or business entities who are acting in concert with the defendants.

## IV.     The Fidelity Default Enterprise

### a. *Organization of Mortgage Financing*

18.     In today's mortgage market, lenders, originators and brokers quickly assign promissory notes and mortgages  through a complex and opaque series of structured finance transactions involving as many as a dozen different strategically organized companies, many of which are designed as remote bankruptcy entities.

19.     A minimum of 80% of all mortgage loans are transferred into large pools, and the income from those loans are "structured" into different classes and tranches to different types of sophisticated and institutional investors including hedge funds. This process is  referred to as mortgage backed securitization.

20.     The securitized notes, are bundled together in mortgage pools that are transferred and sold into special purpose vehicles and trusts in which participation certificates are then offered and sold to institutional investors. Such trusts are under the direction and control of a trustee which in many vases will be an affiliate or partner of an investment banking firm or bank.

21.     Because the trusts have essentially no organizational structure, the task of collecting the monies due for principal and interest are contracted to mortgage servicing companies, generally including a master servicer and other delegated servicers and sub-servers  who collect the payments from the mortgagors and disburse them to the mortgage trusts. Such servicers keep a small percentage, usually .005% as servicing fee.

22.     Servicing rights to the mortgage loans have become a major commodity subject to sale, barter and trade.

23.     Defendant MERS was created by the financial community to facilitate the assignment and transfer of mortgages by creating an electronic mortgage assignments database . Mortgages assignments are recorded by privately and electronically by MERS but not recorded in the traditional place for keeping such records – the local county

clerk's offices. In this way, MERS allows the financial community to escape recording fees for the frequent assignment of the mortgages

24.     In addition MERS concealment of the true note holder and beneficial owner prevents borrowers like the Plaintiffs short paying their debt, repurchasing their note, rescinding their note or suing the note holder for various violations of law that may have occurred in the origination and servicing of their loan.

25.     .MERS does not acquire the mortgage note and only holds legal title to members' mortgages in a nominee capacity and is contractually prohibited from exercising any rights with respect to the mortgages (i.e., foreclosure) without the authorization of the members. Further, MERS does not own the promissory notes secured by the mortgages and has no right to payments made on the notes. MERS merely "immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur.

26.     The payment of principal and interest due from mortgagors is often guaranteed by either government or private mortgage insurance and it is the presence of these guarantees which has until now made the mortgage pools a stable, insured investment.

27.     Unconventional and sub-prime loans that do not meet the standards for guarantee by federal agencies such as FHA, HUD and Ginnie Mae and government enterprises such Fannie Mae and Freddy Mac are pooled into private mortgage backed securitizations. To make such loans acceptable for pooling, private mortgage guarantee insurance and credit enhancement is obtained.

**b.  *Default Mortgage Servicing***

28.     A most lucrative area of mortgage servicing is default and special mortgage servicing servicing.

29.     After default, servicing rights are frequently transferred to specialized default mortgage servers and/or special servicers.

- 6 -

30.     The default and special servicer pass on the principal and interest to the true mortgage note holder. Special fees charged because of the default such as late fees, BPO fees and other assessments are retained by the default or special servicer mortgage servicer.

31.     Typically, if the property is purchased at foreclosure sale by default, special servicer or MERS, any profit in excess of the net amount bid often called the net liquidation proceeds remains with the default or special servicer as part of their compensation..

32.     The original principle and any accumulated interest or a percentage thereof is transferred to the true note holder/trust.

33.     Identifying the actual holder of the note and mortgage after default is always difficult because of the complex relationship of trustee, trust pool, guarantor and various servicers involved in each loan. If the guarantor has paid the defaulted sum, it may be subrogated to the right to collect on the default.

**c.   *Mortgage Servicing Fraud***

34.     The immense profitability of default mortgage servicing has led to adoption of procedures and processes by the mortgage servicing industry to maximize default potential and thus the profitability of the servicing contracts.

35.     "Mortgage Servicing Fraud" is committed when the lender or lender's servicer manipulates *performing* loans to falsely indicate a default by: such means as(a) Entering on-time payments as late, to exact illegal and unauthorized fees; (b) Falsely reporting a default to the credit bureaus when it is the *servicer* creating the default; (c) Refusing payments to guarantee default; (d) Adding thousands of dollars in unearned legal fees to create a default; (e) Ignoring customer complaints and "qualified written requests"; (f) Arrogantly violating numerous laws and regulations.; (g) Falsifying records; (h) Commit fraud upon the courts by stating they are the owner of the note and mortgage when they are not; (i) Intentionally cause delays to run up legal expenses; (j) Forging documents; (k) Blatantly committing fraud upon the courts; (l) Not adhering to the terms of the loan documents; (m) Not applying payments to principal and interest; (n) Committing perjury

- 7 -

through flagrant misrepresentations to the courts; (o)Conjuring up events that never happened and refusing to provide documentation to support these fallacies; (p) Failing to respond in a timely manner to inquiries.

36.    Each and everyone of the above mortgage fraud practices are in fact a part of the defendants conduct in  their attempts to turn the realize unjustifiable and illegal profits from the Schuh mortgage.

37.    As will be specifically alleged infra, some but not all of these practices are reflected in the conduct of the defendants in the this case.

### d.  *The Fidelity Default Enterprise*

38.    In order to capitalize on the high profitability of default mortgage servicing, FIDELITY NATIONAL organized and funded FIDELITY DEFAULT and FIDELITY FORECLOSURE SERVICES.

39.    FIDELITY NATIONAL further causes its divisions to enter into joint ventures, contractual relationships and partnerships with mortgage servicers, law firms and other providers of services in mortgage foreclosure actions as well as the disposition of foreclosed real estate in the REO market.

40.    FIDELITY NATIONAL marketed these services on the Internet on various web pages and described its operations as follows::

> "The Total Default Solution
>
> "Imagine how much easier your life would be - and how much more efficiently your company could operate
> - if you could have a single point of contact for processing all of your default title and closing orders, virtually anywhere in the U.S.
>
> Now stop imagining. And start processing.
> Because that's exactly what the Default Title and Closing Services division from industry leader Fidelity National Default Solutions (FNDS) gives you - seamless services and consistent quality control throughout the entire default cycle, from pre-foreclosure through REO asset disposition. Our integrated solutions eliminate the hassle and errors that traditionally occur when multiple companies are used for default services.

We're committed to providing state-of-the-art, customized services combined with leading-edge technologies - at extremely competitive prices - providing title and closing services faster, easier and more cost-effectively than ever before possible.

Foreclosure Title
All foreclosure title is provided quickly and efficiently via electronic delivery. We also perform title curative work to avoid delays in the foreclosure process.

Our fast turnaround and accurate reporting enable FNDS to meet or exceed the strict service requirement demands placed on your company by investors such as Fannie Mae, Freddie Mac, HUD and VA. All foreclosure title work is issued at the lowest filed rate available." See EXHIBIT D, a copy of a FIDELITY web page.

41.    As a part of it default services, FIDELITY NATIONAL through its divisions contracts with and retains law firms to represent mortgage servicers in foreclosure actions; prepares affidavits and affirmations which are executed on behalf of the mortgage servers and MERS by Fidelity National employees and/or the attorneys who they have retained.

42.    At all times FIDELITY NATIONAL's provision of those services was concealed from  the various courts in which the actions are pending and the pretense that the action is being maintained by the mortgage sevicers or MERS is preserved.

43.    On information and belief, the FIDELITY DEFAULT ENTERPRISE was organized and functioned not later than 20001 and continues to this day.

44.    The use of interstate wire communications and the mails was an essential part of the Enterprise and contemplated by all its principal participants and co-conspirators.

45.    In addition to these of the instrumentalities of the interstate commerce to conduct the business of the enterprise the actions of the enterprise used goods and services that flowed in interstate commerce and the mortgage pools which were serviced by the enterprise were sold in interstate commerce and around the world.

- 9 -

**COUNT ONE: RACKETEERING ACTS N THE CONDUCT OF THE FIDELITY DEFAULT ENTERPRISE**

**I.        The Scheme and Artifice to Defraud Plaintiffs.**

**a.  *The mortgage loan and note***

46.    On or about September 16, 1994, plaintiffs entered into a note in the principle sum of $66,000 payable to PERSONAL MORTGAGE CORPORATION ("PMC") and secured by a mortgage of even date on their home. The Mortgage was a second mortgage junior lien. See Exhibit E, Mortgage & Note

47.    The mortgage contained the following provision for the giving of notices by and between the plaintiffs and the mortgagee:

> . AGREEMENT ABOUT GIVING NOTICES REQUIRED UNDER
> THIS MORTGAGE":
> "Unless the law requires otherwise, any notice that must be given under
> this Mortgage will be given by delivering it or mailing it **by certified mail**
> addresses to me [The Mortgagor] at the address stated in the section above
> titled "Description Of The Property". **A notice will be delivered or**
> **mailed to a different address if I give Lender a notice of my different**
> **address**." Ex. E, p. 16

48.    Because mail service to the physical address of the plaintiffs' home was irregular and sometimes only seasonal, Plaintiffs promptly gave the required notice that their mailing address was: at "PO Box 668, Lake Luzerne, NY 12846".

49.    All correspondence received by Plaintiffs from any lender or servicer was properly addressed to "PO Box 668, Lake Luzerne, NY 12846" pursuant to section 15 of the Mortgage.

50.    On September 16, 1994, PMC assigned the loan to BENEFICIAL FINANCE COMPANY.

51.    Eventually, the servicing of the mortgage loan was acquired by Household Finance ("Household') and Household itself was acquired by HSBC which for a time continued to do mortgage servicing under the name of Household Mortgage Servicing.

52.    Annexed hereto as Exhibit  F is an assignments from PMC to BENEFICIAL FINANCE and as Exhibit G, an assignment from BENEFICIAL FINANCE to MERS as nominee of HOUSEHOLD.

53.    On information and belief, the interest being transferred by the assignment from BENEFICIAL FINANCE to MERS as nominee was not the beneficial ownership of the Note and/or mortgage. But the rights to service said mortgage and note on behalf of undisclosed principals.

54.    On information and belief, by January 2004, Plaintiffs had paid-off the senior lien on the home and Plaintiff Christopher Schuh sought pay-off figures from Household. Because he thought he was negotiating a final pay-off of the note and mortgage, he was ready willing and able to pay whatever was finally determined to be the money necessary to p[y-off and discharge the mortgage note.

55.    On April 13, 2004, HOUSEHOLD/HSBC  in response to a request for information from Mr. Schuh mailed to Mr. Schuh from the national offices of HSBC Mortgage Services the letter which is attached hereto as EXHIBIT H.

56.    In that letter, HSBC made the following the statement:

"In your correspondence you states [sic]that "I must address this issue under The Fair Debt Collections Practices Act". As a point in information, Household is not a debt collector as defined in the Fair Debt Collection Practices Act ("FDCPA"). Household is excluded from the definition of "debt collector" under FDCPA 15 USC1962(A) and/or (B). According to the Fair Debt Collection Practices Act a debt collector is any person who regularly collects debts owed to others. Household is not acting in the capacity of a debt collector since your loan is not owed to a third party."

57.    On information and belief, that statement is objectively false because Household (HSBC) was in fact a mortgage servicer collecting debts owed on the mortgage note to the beneficial owners of the note who were not disclosed, but concealed from plaintiffs.

58.    In the same letter, HOUSEHOLD assured Mr. Schuh that no mortgage foreclosure action was contemplated.

59.    At no time prior to May 2004 were the plaintiffs informed of any interest by MERS in the note and/or mortgage they had executed on their home or the transfer of any servicing rights to MERS.

**b.  *The foreclosure action and frauds on the court.***

60.    On information and belief, at a point in time prior to May, 2004, HOUSEHOLD/HSBC contracted with FIDELITY NATIONAL to provide default services in the foreclosure of the mortgage on Plaintiffs' home.

61.    On information and belief, among the services provided by FIDELITY were the retention of local counsel (the DRUCKMAN FIRM) and the preparation of pleadings, affidavits, affirmations and other documents in connection with the foreclosure action.

62.    On May 4, 2004, defendant DRUCKMAN FIRM filed commenced an action to foreclose the mortgage on plaintiffs' home on behalf of defendant MERS as plaintiff by filing a summons and complaint with the County Clerk of Saratoga County. See Exhibit I, annexed.

63.    Said complaint contained numerous false statements and misrepresentations including, *inter alia*:

> 1 . At all times hereinafter mentioned plaintiff was and still is a corporation having an office or the conduct of business at 636 Grand Regency Boulevard, Brandon FL 33510 .
> ***
> 4. The plaintiff is still the owner and holder of the note and mortgage .

64.    Said statements are objectively false in that Plaintiff (MERS) did not have an office in Bradenton Florida and that Plaintiff was not an owner of a note and mortgage but on information and belief was  the nominee of the holder of servicing rights to the mortgage and note.

65.    On information and belief, the actual beneficial owner of the note and mortgage was at no time disclosed and the has not been disclosed to this date.

66.    Plaintiffs discovered they had been sued and mailed a written reply to the DRUCKMAN FIRM (See EXHIBIT J, (Plaintiffs' Reply)annexed.

67.    Among other things, Exhibit J questioned the interest and status of defendant MERS to be collecting the debt on the mortgage and reaffirmed plaintiffs intent to pay all amounts due on his mortgage

68.    Thereafter, the defendant DRUCKMAN FIRM moved for summary judgment on behalf of defendants MERS. A copy of the motion and supporting documents for the motion for summary judgment is annexed as Exhibit K.

69.    The motion for summary judgment was mailed to the physical address of the property instead of the post office box which HOUSEHOLD/HSBC was informed of by the plaintiffs and regularly sent correspondence.

70.    Plaintiffs were uniformed of the motions for summary judgment although they continued to correspond with Household/HSBC.

71.    Defendant MERS was granted summary judgment and the court signed a boiler plate order that had been submitted by the DRUCKMAN FIRM at the time in filed the motion for summary judgment. SEE EXHIBIT L, annexed.

72.    On information and belief, the form of said boiler-plate summary judgment order was transmitted to the DRUCKMAN FIRM by FIDELITY by use of overnight delivery service and/or an interstate wire transmission.

73.    Thereafter the DRUCKMAN FIRM applied for a judgment of foreclosure and in the application submitted an affidavit of defendant GOEBEL (Exhibit C) and defendant KLEIN (Exhibit M).

74.    In her affidavit, GOEBEL represented that:

> I am the attorney in fact of HOUSEHOLD FINANCIAL REALTY CORPORATION, the servicing agent for plaintiff in the within action and am in charge of all delinquent mortgage accounts, and affirm the figures contained in the following statement have been taken from records in my office."

75.    Said statement is objectively false in that the plaintiff in the action was MERS, and as previously alleged, MERS does not acquire a mortgage or note and only holds legal title to members' mortgages in a nominee capacity and is contractually prohibited from exercising any rights with respect to the mortgages (i.e., foreclosure) without the

authorization of the members. Further, MERS does not own the promissory notes secured by the mortgages and has no right to payments made on the notes. MERS merely "immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur."

76.    In his affirmation, defendant KLEIN affirms that:

"None of the defendants have served an answer to the complaint,
nor have they made any motion with respect thereto and none of the
defendants have appeared, .except:

"(a) CHRISTOPHER SCHUH; DIANE SCHUH interposed
and answer which answer was stricken by prior order of this court,
and who appeared by their attorney ; and waived service of all papers
upon this application."

77.    The above statement is objectively false, in that, (a) the reply of the plaintiffs to the complaint was not submitted to the Court and thus could not have been stricken; and (b) at time of the KLEIN affirmation the plaintiffs had not appeared by an attorney; and (c) the plaintiffs had not waived service of any application.

78.    On information and belief, the KLEIN affirmation was prepared by FIDELITY and transmitted to the DRUCKMAN FIRM by interstate wire or the mails.

79.    Pursuant to the application of the defendant DRUCKMAN FIRM the court signed a judgment of foreclosure and sale, see Exhibit O, annexed.

80.    When plaintiffs returned from a vacation in February, 2005, they discovered that their home had been advertised for an imminent mortgage foreclosure sale. They retained  an attorney, Frank Romano, Esq.,  to set aside the summary judgment and he obtained a stay of the sale.

81.    Plaintiffs at all times desired to pay-off the mortgage. However, these efforts were frustrated by the confusion as just who the mortgagee was and it was impossible to resolve the pay-off figures.

82.    Annexed as EXHIBIT O is a copy of letter which on information and belief was sent to HSBC by a mortgage broker who was attempting to arrange such a pay-off.

83.    Attached as Exhibit P is a letter sent by Mr. Romano to the court expressing frustration with HSBC's inability to arrive at a pay-off figure consistent with the pleadings in the case or the record of payments made.

84.    The court denied the request by Mr. Romano for a conference and denied the motion to set aside the summary judgment without a hearing. Mr. Schuh served and filed a timely notice of appeal from that determination which is still pending.

85.    Mr. Schuh then delayed the reschedule of the foreclosure sale by filing a Chapter 13 proceeding in the United States Bankruptcy Court but he withdrew that petition and the sale was scheduled and conducted.

86.    At the foreclosure sale of his home, Mr. Schuh appeared and was the successful bidder, making a partial payment of $14,160. See EXHIBIT Q, Terms of sale and EXHIBIT R, receipt of partial payment.

87.    Prior to closing of the sale, Mr. Schuh made a motion by Order to Show Cause for a rehearing of the motion for summary judgment and obtained a temporary restraining order of the closing of the sale.

88.    That motion was denied. An appeal of that denial was consolidated with the appeal of the motion denying the application to set aside the summary judgment and the judgment of foreclosure. Said appeal is still pending.

**c.  *Defendants' frustration of Plaintiffs efforts to close the first foreclosure sale and pay-off the mortgage.***

89.    After the denial of Plaintiffs' motion for a rehearing, the DRUCKMAN FIRM mailed a letter to plaintiffs attorney setting a closing date for the closing of the foreclosure sale and making time of the essence.

90.    Plaintiffs again asked the assistance of Mr. Waters of Countrywide Mortgage for assistance in financing the purchase.

91.    Mr. Waters obtained a commitment from Countrywide to finance the sale but needed a two day adjournment to clear-up a flood insurance issue.

92.   Mr. Waters office is in the state of Massachusetts and all his telephone conversations with Ms. Olivari were interstate wire communications within the purview of the Wire Fraud statute.

93.   When he initially requested the adjournment, he was informed on the telephone by Ms. Olivari that such an adjournment would be granted only if the plaintiffs and their attorney gave general releases to the defendants. When, Mr. Waters asked that that the request be put in writing, Ms. Olivari replied by refusing to adjourn the closing for a few day as requested and directing the referee to reschedule the closing. She notified interested parties of this determination by mail.

94.   By clear provisions of the Terms of the Foreclosure sale at which Mr. Schuh had bid, upon cancellation of the sale, the partial payment was to be paid to the mortgagee for the credit of the mortgagor. (Ex, Q)

95.   From that day forward, the payment must be paid to the mortgage and a recalculation of the amortization of the principle and interest must occur. Such was not done.

96.   The second sale was schedule for November, 2006. In October, 2006, defendant DRUCKMAN FIRM delivered to the plaintiffs a letter stating the amount needed to discharge the mortgage. That amount was $104,860 and included no credit for the partial payment the referee had received from Mr. Schuh. See Exhibit

97.   Thereafter Mr. Schuh filed another Chapter 13 petition but he was required to apply an extension of the automatic stay because of his prior filing.

98.   In the ,meantime, Mr. Waters of Countrywide again sought to obtain financing to pay-off and discharge the mortgage.

99.   On November 29, 2006, the DRUCKMAN FIRM sent by wire to THERESA GIANNAVOLA, an attorney for a title company in the State of Rhode Island, a facsimile letter requiring that the mortgage be paid-off in two checks: one to HSBC Mortgage Services for $111,938.55 and one to the DRUCKMAN FIRM for $13,250 for a total pay-off of $125,188.55. Said figure allowed no credit to the plaintiffs for the partial payment made at the first sale. A copy of that Pay-out letter is annexed as Exhibit T

100.  On information and belief, because of the wide disparities in the pay-out demanded by the DRUCKMAN FIRM and confusion as to identity of the payee of the pay-out caused by the entry of judgment in the name of MERS, Countrywide declined to continue efforts to refinance the mortgage.

101.  On December 12, 2006, the Bankruptcy Court denied Mr. Schuh and extension of the automatic stay.

102.  On December 15, 2006, there was deposited in Court on behalf the Plaintiffs the sum of $106,000 (Exhibit U, annexed) and on January 4, 2007, an additional $7,500 was deposited (Exhibit V, annexed). However, although $127,660 is now being held to the credit of the plaintiffs, New York courts have yet to cancel the sale by foreclosure of the premises which is now scheduled for January 22, 2007 despite the fact that Ms. Olivari, on behalf of MERS, filed an affirmation with the N.Y.S. Supreme Court in Saratoga County stating that that on December 15, 2006, the amount needed to pay-off the mortgage was $111,938.55.

## II.       Defendants' Specific Racketeering Acts

103.  The use of the mails (18 U,S,C, §1341) or interstate wire transmissions (18 U.S.C. §1343) (wire fraud) are prohibited in furtherance of "[a]ny scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises…"

104.  There at both common and statutory law, a implied covenant of fair dealing in any contract, including mortgages and mortgage notes.

105.  The actions of the defendants in operating the FIDELITY DEFAULT ENTERPRISE, as alleged herein, to capitalize on plaintiffs' mortgage and note by (1) attempting to collect illegal and fees and charges; (2) forcing them into foreclosure in order to profit from any unrealized equity; and (3) refusing to bargain in good faith for a pay-off of the mortgage note; is a scheme or artifice to defraud as defined by both Sections 1341 and 1343.(the "Fidelity Fraudulent Scheme").

106.   In furtherance of the Fidelity Fraudulent Scheme, the defendants caused to be transmitted by means of (1) the mails; (2) overnight  delivery service or (3) interstate wire communications, documents including account statements, responses to requests  for information, boiler plate pleadings and affidavits, all in violation of. §1341 and/or § 1343 which make criminal such the use of mails, overnight delivery service or interstate wire communications in furtherance of a scheme or artifice to defraud.

107.   The following Table identifies for each act of mail or wire fraud the Exhibit Letter, the date of the act, the sender/receiver, the method of transmission and a description of the transmission. Where "Wire" is indicated, it means an interstate wire transmission in violation of 8 U.S.C. §1343. Where "Mail" is indicated, it means the use of the mails in violation 18 U.S.C. §1341.

| EXHIBIT | DATE | SENDER/ RECIPIENT | METHOD | DESCRIPTION |
| --- | --- | --- | --- | --- |
| C | 10/4/04 | FIDELITY/ DRUCKMAN | Mail or Wire | Dory Goebel Affidavit |
| H | 4/13/04 | HOUSEHOLD/ Plaintiff | Mail | Letter from Household |
| I | 5/4/04 | DRUCKMAN/ Plaintiffs | Mail | Misdirected Summons and Complaint |
| K | 7/9/04 | DRUCKMAN/ Plaintiffs | Mail | Misdirected Motion for Summary Judgment |
| L | Prior to 7/9/04 | FIDELITY/ DRUCKMAN | Mail or Wire | Boiler Plate Summary Judgment |
| M | Prior to 12/10/04 | FIDELITY/ DRUCKMAN | Mail or Wire | Boiler plate Affirmation of  Edward Klein |
| N | Prior to 12/10/04 | FIDELITY/ DRUCKMAN | Mail or Wire | Boilerplate Judgment of Foreclosure |
| Q | 3/22/06 | FIDELITY/ DRUCKMAN | Wire | Terms of Sale |
| R | 3/22/06 | FIDELITY/ DRUCKMAN | Wire | Receipt of sale |
| S | 10/24/06 | HSBC/ DRUCKMAN | Wire | Pay-off letter |
| T (pp 1 & 2) | 11/29/06 | DRUCKMAN/ THERESA GIANNOVOLO | Wire | Pay-off letter |
| T (p. 2) | 11/28/06 | HSBC/ DRUCKMAN | Wire | Pay-off letter |
| X | 10/10/06 | OLIVARI/ COUNTRYWIDE | Wire | Cancel closing |

| | 10/6/06 | OLIVARI/ Waters | Wire | 2 Telephone conversations re rescheduling of closing |
|---|---|---|---|---|

108.  By reason of the foregoing, each defendant indicated violated Section 1341 and/or Section 1343 of Title 18 of the United States Code on more than two occasions.

109.  By reason of the foregoing, said defendants conducted the affairs of the FIDELITY DEFAULT ENTERPRISE through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

Conspiracy

110.  Each of the Defendants conspired to violate 18 U.S.C. §1962(c) with each other in order to effectuate the Fidelity Fraudulent Scheme and each of the racketeering acts set forth above constituted an overt act in furtherance of that conspiracy.

111.  By reason of the premises aforesaid, each and very defendants has individually and severally violated 18 U.S.C. §1962(d).

## III.    Damages

112.  By reason of the foregoing violations of 18 U.S.C. § 1962(c) and § 1962(d), each plaintiff suffered damages to his property in such amount as may be determined but at least in the amount of $1,o00,000.

113.  Said property damages include, but are not limited to, payments for fees and expenses in attempting to pay-off the note an mortgage; interest paid at excessive rates because the defendants refused to allow the mortgage to be paid-off; damages to their credit.

114.  Defendants offenses are ongoing and it can be reasonably anticipated that future damage to property may result.

115.  By reason of the forgoing, plaintiffs have suffered damages in the sum of $1,000,000.

116.  Pursuant to the provisions of RICO, said damages as are found due must be trebled and the plaintiffs

## COUNT TWO: VIOLATIONS OF FDCPA

117.   Plaintiffs repeat and reiterate each and very allegation contained in paragraphs "1" to "111" with the same force and effect as though the same were hereinafter more completely set forth.

118.   Each of the defendants are "debt collectors" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

119.   Set forth in the following table are false representations made by the defendants to plaintiffs in violation of the FDCPA, 15 U.S.C. § 1692e

| EXHIBIT | FALSE REPRESENTATIONS |
|---------|------------------------|
| C | (1) That Household was the mortgage servicer for MERS and that amount claimed was due and owing |
| H | That Household was not subject to the FDCPA and that no mortgage foreclosure was anticipated |
| I | That MERS owned the Note and Mortgage |
| K | That proper service was made |
| M | That Plaintiffs had appeared by an attorney in the foreclosure action and waived further notice |
| S | That there was due and owing HSBC the amount claimed |
| T | That there was due and owing the amount claimed |

120.   There were other misrepresentations and violations of the FDCPA that will be specified during discovery.

121.   By reason of the foregoing violations of the FDCPA, plaintiffs have suffered damages to their property in such amount as may be determined but at least in the amount of $1,000,000.

122.   Said property damages include, but are not limited to, payments for fees and expenses in attempting to pay-off the note and mortgage; interest paid at excessive rates because the defendants refused to allow the mortgage to be paid-off; damages to their credit.

123.   Plaintiffs have also suffered emotional distress and strain, all to their damage in the sum of $1,000,000.

124.   Defendants offenses are ongoing and it can be reasonably anticipated that future damage to property may result.

125.   By reason of the forgoing, plaintiffs have suffered damages in the sum of $2,000,000 and defendants are subject to punitive damages in such amount as a jury may find reasonable but not less than $6,00,000. and their attorney fees.

### COUNT THREE: COMMON LAW FRAUD

126.   Plaintiffs repeat and reiterate each and very allegation contained in paragraphs "1" to "111" with the same force and effect as though the same were hereinafter more completely set forth.

127.   The actions of the defendants alleged aforesaid, constitute common law fraud in which each and every defendants is a joint tortfeasor.

128.   By reason of the foregoing, plaintiffs have suffered damages to their property in such amount as may be determined but at least in the amount of $1,000,000.

129.   Said property damages include, but are not limited to, payments for fees and expenses in attempting to pay-off the note and mortgage; interest paid at excessive rates because the defendants refused to allow the mortgage to be paid-off; damages to their credit.

130.   Plaintiffs have also suffered emotional distress and strain, all to their damage in the sum of $1,000,000.

131.   By reason of the foregoing, plaintiffs are entitled to an injunction barring the transfer of their home by reason of the fraudulently obtained judgment of foreclosure.

132.   By reason of the forgoing, plaintiffs have suffered damages in the sum of $1,0000,000 and defendants are subject to punitive damages in such amount as a jury may find reasonable but not less than $3,000,000.

## COUNT FOUR: DECLARATORY JUDGMENT, EQUITABLE LIEN AND INJUNCTION

133.   Plaintiffs repeat and reiterate each and very allegation contained in paragraphs "1" to "111" with the same force and effect as though the same were hereinafter more completely set forth.

134.   As alleged aforesaid, plaintiffs have (1) deposited $113,500 into Court and are entitled to a credit of $14,160 dollars by reason of the partial payment made at the cancelled sale of the premises.

135.   By reason of the payment into court, plaintiffs were entitled to have the foreclosure sale cancelled by reason the New York State Real Property Actions and Proceedings Law (RPAPL) §1341 which provides:

> § 1341.  Payment into court of amount due
>
>    Where an action is brought to foreclose a mortgage upon real property upon which any part of the principal or interest is due, and another portion of either is to become due, and the defendant pays into court the amount due for principal and interest and the costs of the action, together with the expenses of the proceedings to sell, if any, the court shall:
> 1. Dismiss the complaint without costs against plaintiff, if the payment is made before judgment directing sale; or
> 2. Stay all proceedings upon judgment, if the payment is made after judgment directing sale and before sale; but, upon a subsequent default in the payment of principal or interest, the court may make an order directing the enforcement of the judgment for the purpose of collecting the sum then due.

136.   Defendants are obligated by common law and New York State Statute to deal fairly with the plaintiffs and a proceeding to foreclose a mortgage is an equitable proceeding subject to the laws of equity.

137.   Defendant Olivari has filed an affirmation that states on December 15, 2006, the amount necessary to pay-off the mortgage was $111,938.55.

138.   Although timely application has been made for an order pursuant to RPAPL §1341, the New York courts have not cancelled the sale scheduled for January 22, 2007.

139.   Under the principals of equity, plaintiffs are entitled to a judgment declaring that they have an equitable lien on the premises in the amount of their deposits and credit in the sum of $127,660.

140.   Under the principals of equity, plaintiffs are entitled to an injunction barring the transfer of the premises to any purchaser at the foreclosure sale, should it take place who has either constructive or actual notice of plaintiffs claims in this action.

141.   Plaintiffs home is unique real property and that have no remedy at law should there property be transferred pursuant to a mortgagee foreclosure sale.

WHEREFORE, plaintiffs demands judgment as set forth in COUNTS ONE, TWO, THREE and FOUR.

Dated: New York, New York
        January 17, 2007

_____
JOHN C. KLOTZ (4162)
Attorney for the Plaintiffs
350 Fifth Avenue, Suite 4810
New York, New York 10118
(212) 630-2600